## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### OCALA DIVISION

UNITED STATES OF AMERICA

VS.                                          CASE NO. 5:20-cr-77-JA-PRL

HOWARD D. FARLEY, JR.

_____

## MEMORANDUM ORDER

On February 27, 2020, Defendant Howard D. Farley, Jr., purporting to be Tim Brown, applied for renewal of a United States passport. Doing so brought down a house of cards that Defendant had carefully constructed and guarded for decades: until his December 2020 arrest in this case for aggravated identity theft, Defendant had successfully used Tim Brown's stolen identity for more than thirty-five years to avoid prosecution for serious federal drug charges in the District of Nebraska.

Vigilant government officials processing the 2020 passport renewal application determined that Tim Brown died as an infant in 1955 and that the applicant was an imposter. On November 30, 2020, a magistrate judge in the Middle District of Florida signed a criminal complaint charging "John Doe" with passport fraud, and two days later federal agents arrested Defendant at his home in Weirsdale, Florida—the home located at the

address listed on the passport renewal application. During the ensuing search of the home pursuant to a search warrant, agents recovered a firearm and more than one hundred rounds of ammunition from the nightstand in the master bedroom. The agents also found family photographs from Defendant's childhood and a birth announcement, from which—along with Defendant's fingerprints—they were able to determine that Defendant's real name is Howard D. Farley, Jr.[1]

A grand jury in the Middle District of Florida returned a Superseding Indictment charging Defendant with five crimes. In April 2021, Defendant entered guilty pleas to three of those charges: Count One, False Statement in Application and Use of Passport (18 U.S.C. §§ 1542 and 2); Count Two, Aggravated Identity Theft (18 U.S.C. § 1028A(a)(1); and Count Six, Operating as an Airman Without a Legitimate Airman Certificate (49 U.S.C. § 46306(b)(7)).[2] It is now the Court's duty to impose a reasonable sentence, meaning one that is

---

[1] Defendant's fingerprints matched those taken from Howard D. Farley, Jr. when he was arrested in 1966 and 1969 in Nebraska.

[2] The Superseding Indictment also charged Defendant with Social Security fraud (Count Three) and possession of a firearm and ammunition by a convicted felon (Count Four). Defendant had a prior 1969 felony conviction in Nebraska state court for accessory after the fact to burglary.

"sufficient[] but not greater than necessary" to meet the Congressionally established purposes of sentencing.  18 U.S.C. § 3553(a).

By statute, Count Two (Aggravated Identity Theft) calls for a mandatory two-year prison sentence consecutive to the sentences on the other counts.  See 18 U.S.C. § 1028A(a)(1), (b).  And the maximum sentence for Defendant's crimes is fifteen years—ten years on Count One, two years on Count Two, and three years on Count Six.  The Presentence Report (PSR) prepared by the Probation Office includes a calculation of the Defendant's sentencing guideline score, advising that the Total Offense Level is 10 and that Defendant's criminal record places him within Criminal History Category I.  The parties agree that this calculation is correct.  Thus, the advisory sentencing range is 6–12 months' imprisonment for Counts One and Six followed by 24 months' imprisonment for Count Two, for a total of 30–36 months imprisonment.  The supervised release range for Count One is 1–3 years, and for Counts Two and Six it is a maximum of one year.  The fine range is $4,000–$40,000.

But both the Government and Defendant assert that a reasonable sentence would fall outside the guideline range.  The Government

contends that Defendant should receive a sentence in excess of the advisory guideline range and urges me to impose a term of sixty months in prison.  In making that argument, the Government relies on various guideline policy statements permitting upward departures.  In the alternative, the Government argues that an upward variance is required under 18 U.S.C. § 3553.  Defendant, on the other hand, implores me to impose a prison term below the guideline range, contending that the two-year mandatory sentence for aggravated identity theft is sufficient to satisfy the goals of sentencing.

Determining a reasonable sentence under 18 U.S.C. § 3553 is often a difficult task, but it is especially so in this case.  I carefully reviewed the statutory purposes of sentencing, memoranda submitted by the parties, and the advisory sentencing guidelines.  I also considered the attorneys' arguments, the attorneys' many submissions, and letters from Defendant, his relatives, and his friends.  Finally, I was assisted by the PSR prepared by the Probation Office.

## I.   Background

In 1984, federal agents were investigating members of an organization that they believed were conspiring to distribute cocaine in

Nebraska and elsewhere. The agents also believed that Defendant was the leader of that organization. While the investigation was ongoing, an employee of the Lincoln Telephone Company leaked information to one of the co-conspirators that the Government was "wiretapping" members' telephones. On August 22, 1984, Defendant telephoned his sister on his way back to Nebraska from Mexico. She told Defendant about the wiretap and cautioned him to be careful.

Defendant returned to Nebraska on August 23 and stayed through August 29. During his stay, Defendant entered the First National Bank of Lincoln and went to the vault where safe deposit boxes are maintained. A short time later, Defendant left the bank carrying a large bulging vinyl bag. Defendant was next seen on November 1, 1984, when he flew to Miami after a "day trip" to the Cayman Islands; although Defendant was subjected to an intensive inspection at the request of the DEA, he had no luggage with him and passed that inspection. He returned to Nebraska for the Thanksgiving holiday but promptly left after discovering a tracking device on his car. Defendant has not been seen in Nebraska since.

In November 1985, a grand jury in the District of Nebraska returned an indictment charging Defendant with six felonies and identifying him

as the "kingpin" of a vast conspiracy to distribute cocaine involving twenty-three co-conspirators.    The indictment referred to the co-conspirators as the "Farley Organization."[3]    As the investigation proceeded, twelve more related indictments were returned.    In all, seventy-four defendants were charged.  Of the twenty-three co-defendants charged in the same indictment as Defendant, twenty-one were convicted. The charges against one of the co-defendants were dismissed, and another co-defendant died while the charges were pending.  Of the seventy-four total alleged conspirators, only Defendant failed to answer the charges.

Defendant met his wife, Hahn Vu, while she was vacationing in St. Maarten in 1985.  In 1987, a witness reported that during the summer of 1986 Defendant hired him to transport Defendant's 55-foot catamaran— named the *Déjà Vu*—from St. Maarten to Miami.  This information is consistent with statements Defendant earlier made to a co-conspirator about his plan to stop selling drugs and purchase a $225,000 boat. Defendant later owned a boat that he kept in South Florida.

After assuming Tim Brown's identity and before committing the

---

[3] During the sentencing hearing in the case at bar, Defendant minimized the activity of the conspiracy, claiming that only ounce amounts were involved.  But by any measure, it was a large operation involving a substantial amount of cocaine.

crimes in this case, Defendant used Tim Brown's identity as his own daily. He used the name Tim Brown in dealing with agencies of state and federal government. At some point he acquired Tim Brown's birth certificate, and in 1982 he applied for and obtained a Social Security number in Tim Brown's name. He also applied for and obtained a replacement Social Security card in 2013. He filed passport applications in Tim Brown's name with the Department of State in 1987, 1998, and 2008. He obtained a pilot's license in the name of Tim Brown in 2000. And in 2013 and 2020, he made false representations to obtain FAA certifications. On each of these occasions, he misrepresented his identity.

I don't have complete information as to Defendant's possible sentence had he been convicted of the drug charges in the District of Nebraska. The guidelines would have depended to some extent on the amount of trafficked cocaine attributed to Defendant, but his pre-<u>Booker</u>[4] guideline range was ten years to life in prison.

Much of the background information the Government provided is old and involves charges of which Defendant was not convicted. Defendant cries foul, emphasizing that he is being sentenced for the charges to which

---

[4] <u>United States v. Booker</u>, 543 U.S. 220 (2005).

he pleaded guilty in this case—not for his conduct in Nebraska during the early 1980s. But that is not the point. The background information explains Defendant's motive for committing the crimes charged in this case. It explains why he went into hiding in 1984 and assumed Tim Brown's identity. And it explains why, over the years, Defendant committed uncharged offenses by using an assumed false identity. In considering the totality of circumstances, including Defendant's history and characteristics—which I must do in crafting a reasonable sentence— this information is critically important.

Defendant also cautions that information regarding his history is so old that it is likely unreliable, raising due process concerns. But a conviction is not necessary for a sentencing court to consider a defendant's past wrongful conduct. See, e.g., 18 U.S.C. § 3661. Furthermore, the District of Nebraska indictment was issued on probable cause. Other information provided to me includes sworn statements and co-conspirator's sentencing statements, and much of that is corroborated by circumstances. Defendant admits being involved with drugs in the past, and he offers no evidence rebutting the abundant evidence of his motive for going into hiding and assuming Tim Brown's identity. The background

information is reliable.

## II.    The Government's Motion for Upward Departure (Doc. 86)

Both parties argue that a sentence within the advisory guideline range would be inappropriate. The Government moves the Court to depart upward pursuant to policy statements contained in U.S.S.G. §§ 5K2.9, 5K2.7, 5K2.0(a)(2)(B), 5H1.8, 4A1.3. Alternatively, it contends that the § 3553 factors require an upward variance. Defendant, on the other hand, argues that the § 3553 factors weigh in favor of a downward rather than upward variance.

Having considered the parties' extensive submissions, I find that an upward variance is called for in this case. Post <u>Booker</u>, motions for departure are rare. There is a trend among district courts to consider facts relevant to departure policy statements in assessing the § 3553 factors. If there are considerations that pertain to a § 3553 variance, "it doesn't matter whether they might also . . . fit under a departure provision." <u>United States v. Hall</u>, 965 F.3d 1281, 1297 (11th Cir. 2020). Thus, it is not necessary to rule on the Government's Motion for Upward Departure. The cited policy statements and the information offered in support of and in opposition to the motion have been considered in determining a

reasonable sentence.  The Government's Motion for Upward Departure (Doc. 86) will thus be denied as moot.

## III.   18 U.S.C. § 3553(a) Sentencing Factors

Congress mandates that district courts impose sentences that are "sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth in 18 U.S.C. § 3553(a)(2). Those purposes are: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(A)–(D).

In addition to the need for the sentence to comply with these purposes, in determining a reasonable sentence courts must consider: "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the kinds of sentences available"; "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the [sentencing] guidelines"; "any pertinent

10

policy statement . . . issued by the Sentencing Commission"; "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct"; and "the need to provide restitution to any victims of the offense." Id. § 3553(a)(1), (3)–(7).

Every defendant and the circumstances of every crime are different. Courts are required to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall v. United States, 552 U.S. 38, 52 (2007) (quoting Koon v. United States, 518 U.S. 81, 113 (1996)). This principle is codified in 18 U.S.C. § 3553(a), which specifies that sentencing courts must consider, among other things, a defendant's "history and characteristics." And "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct." 18 U.S.C. § 3661. I have considered all of the § 3553(a) factors, and although I am not required to specifically address each of them, see, e.g., United States v. Kuhlman, 711 F.3d 1321, 1326 (11th Cir. 2013), I do so below.

11

A.   **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (§ 3553(a)(1))**

Defendant's crimes of conviction were serious attacks on the credibility of important and trusted American institutions. That feature of the case is not remarkable when considered in isolation because it is inherent in the charges. But when considered broadly, the circumstances of the case are atypically serious and do not weigh in favor of leniency.

Defendant did not steal Tim Brown's identity to commit a property crime or even a series of property crimes. Instead, Defendant's crimes of conviction were a manifestation of Defendant's total and decades-long appropriation of Tim Brown's identity for the purpose of avoiding arrest and possible conviction for serious drug offenses. Circumstances indicate that Defendant's disappearance and permanent appropriation of Tim Brown's identity were planned well in advance. He acquired Tim Brown's identity in 1982, and he later told a friend that he planned on leaving the drug business and buying an expensive boat. The plan was successful for more than thirty-five years.

Both counsel for the Government and counsel for Defendant argue that consideration of Defendant's history and characteristics warrants a

sentence varying from the advisory guideline range. The Government focuses on Defendant's entire history, including the use of fraudulent identification up until the time of his arrest. Defendant, on the other hand, encourages the Court to give significant weight to Defendant's stable marriage to Hahn Vu of almost thirty years, his assistance to members of her family, and his role as a good neighbor. According to Defendant, the Court should also give him credit for living arrest-free for 36 years and becoming a valuable member of society. And Defendant cautions that I should consider his sentence in the context of his entire history, with particular focus on Defendant as he is today. In doing so, he urges the Court to disregard or give little weight to his only felony conviction and to his alleged involvement in the Nebraska cocaine distribution conspiracy.

Of course, I agree that the sentence imposed today is only for the crimes in this case and that his prior felony—committed in 1969—was so long ago that it deserves little weight. But Defendant's conduct for the past thirty-six years, including his motive for using Tim Brown's identification to avoid arrest, is certainly relevant here. Defendant went into hiding in 1984 to conceal his identity, and he continued to do so until

13

he was arrested on the charges in this case. And each time he applied for a Social Security Card (1982 and 2013) and each time he applied for a passport or passport renewal (1987, 1998, and 2008), he misrepresented his identity. And he recently (2013 and 2020) made false representations to obtain FAA certifications.

As mentioned, Defendant's crimes were committed to avoid prosecution under the District of Nebraska indictment. Although the1985 Nebraska indictment was ultimately dismissed without prejudice on motion of the United States in 2014, (see Doc. 95 at 1), for thirty years the United States Attorney and law enforcement officials in the District of Nebraska kept the case open and periodically attempted to locate Defendant.[5] This is also relevant. Defendant's sister and brother-in-law—members of the Farley Organization and co-defendants in the case—were sentenced to prison terms of three and ten years, respectively. Meanwhile, Defendant lived the good life. He sailed the Caribbean in a large and expensive vessel he acquired after fleeing Nebraska. He engaged in other hobbies, including scuba diving, deep sea fishing, and flying. And in 1993

---

[5] As explained at the sentencing hearing in this case, after thirty years the agents, witnesses, and officers involved in the Nebraska case were "retiring," "aging out," and "dying," and the evidence had gotten stale.

14

he married Hahn Vu, a successful businesswoman who provided him a comfortable lifestyle even though he never engaged in regular employment. At the time of his arrest, Defendant was living in an upscale fly-in neighborhood with his own hangar to store a $155,000 airplane purchased by his wife in her name.[6]

The record bears out Defendant's claim that he still has the support of family and friends, and I have taken that into account. It is clear that Defendant is a charming and talented person. But when he disappeared, he completely abandoned his family. He missed his mother's, father's, brother's, and sister's funerals, the births of grandchildren, and other important family events. He does not even know the cause of his parents' deaths. And most remarkably, he abandoned two young daughters who needed him, providing them with neither material nor emotional support after absconding when they were teenagers. The fact that one daughter

---

[6] To rebut the Government's suggestion that Defendant had a significant amount of cash from his drug dealings at his disposal when he fled Nebraska, Defendant's counsel insisted that Defendant has no assets of his own and that everything has been purchased by his wife. (See, e.g., Def.'s Notice of Filing Suppl. Exs. in Resp. to Gov't's Sentencing Mem., Doc. 85). But during the sentencing hearing, counsel argued that it is already "significant punishment" that Defendant has had to "give up his interest" in the airplane. The Government then advised that the airplane is titled in Hahn Vu's name. But the name appearing on the airplane title is not relevant for purposes of sentencing.

now forgives him and wants him in her life reflects favorably on her character but not on his. The circumstances show that but for his arrest in this case, he would never have contacted his daughters.

Defendant points out that humanity places great emphasis on redemption. That is true. Redemption is exalted in major religions, moral philosophies, and literature; it is indeed an important feature of our Judeo-Christian culture. And the concept is recognized in our modern caselaw. I often regret that I don't have the tools to credit redemption when imposing mandatory sentences.

There are situations in which courts can and should recognize a Defendant's redemption. Defendant argues that in <u>Gall</u>, the defendant's redemption was recognized by the Supreme Court. In that case, the defendant, a second-year college student, accepted an invitation to help distribute ecstasy. Months later, he withdrew from the conspiracy and stopped using drugs. He went on to graduate from college, start his own business, and become a master carpenter. Four years after his withdrawal, he was charged with conspiracy to distribute drugs. He entered a guilty plea, and the district judge—finding that defendant had "self-rehabilitated"—varied downward from the guideline range and

16

sentenced the defendant to a three-year term of probation. On review, the Supreme Court described the sentence as "reasoned and reasonable" under the circumstances. 552 U.S. at 59–60.

Defendant also directs my attention to Pepper v. United States, 562 U.S. 476, 480 (2011). There, the defendant appeared before the district court for resentencing more than two years after his initial arrest. In imposing a sentence that varied downward from the guideline range, the district court focused on the positive changes Pepper had made. He had completed a drug rehabilitation program, had stopped using drugs, was a student in community college, was working part time, was complying with conditions of his release, and was married and supporting his family. The Supreme Court held that the sentencing court's consideration of defendant's post-sentencing rehabilitation was proper.

But these cases and others cited by Defendant are of no help to him. There was no period of rehabilitation for this court to consider. Defendant was committing identity theft related crimes up until his arrest. That said, I do not question the sincerity of Defendant's remorse, and I credit him for the support he gives to neighbors and members of Hahn Vu's family. But poring over Defendant's history and characteristics has not

17

revealed signs of redemption. Instead, they tell a story of a man who made a calculated decision to ignore those for whom he was responsible and to instead engage in a decades-long fraud that enabled him to live a comfortable, fun-filled life while avoiding the criminal charges against him. Defendant cites Victor Hugo, but Defendant is no Jean Valjean.

In sum, Defendant's history and characteristics do not weigh in favor of a lenient sentence.

### B.    The Purposes of Sentencing (§ 3553(a)(2))

Defendant argues that the mandatory two-year sentence for identity theft is sufficient to satisfy the goals of sentencing. The Government insists that a sentence of less than sixty months would fail to do so. I address the statutory purposes in turn.

> *1.    The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (§ 3553(a)(2)(A))*

As discussed earlier with regard to § 3553(a)(1), Defendant's offenses are serious. And Defendant clearly has showed disrespect for the law. A man with a high tolerance for risk made a wager in 1984. He bet that by adopting Tim Brown's identity, he could avoid prosecution, have fun, prosper, and live a comfortable life. Of course, this gamble required that

18

he abandon his co-defendants, his friends, his family members, and the possibility of having regular legitimate employment. Defendant is an intelligent man, and he saw this wager as having favorable odds. And he was correct; for three and a half decades the scam paid dividends. He never answered the Nebraska indictment, but he continued to commit crimes representing to the Government that he was Tim Brown. Absent the diligence of the federal officers processing the 2020 passport renewal application, he would still be collecting on his wager.

Because of his age (72 years) and poor health, Defendant contends that a two-year sentence—the mandatory minimum on Count Two— would be just punishment. He offers authority showing that for every year served in prison, life expectancy is reduced by two years. He also submits authority that prison conditions are more difficult for older inmates and that his medical conditions will make any prison sentence more severe.

I considered these arguments and paid particular attention to the medical report submitted by Olga Emgushov, M.D., outlining Defendant's medical problems. Defendant should be confined in a Bureau of Prisons medical facility equipped to care for Defendant that can treat his various maladies.

Taking all facts into account, a significant sentence is necessary to reflect the seriousness of the offenses, promote respect for the law, and provide a just punishment.

> 2.    *The need for the sentence imposed to afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)) and to protect the public from further crimes of the defendant (§ 3553(a)(2)(C))*

Defendant argues that there is no correlation between the perception of punishment and the actual punishment imposed. He contends that the notion that lengthy sentences generally deter crime is meritless. The Government does not address this specific argument, but it contends that a lengthy sentence is required to deter Defendant from committing additional crimes.

Despite Defendant's long run of deceiving the Government, his age, marital status, and family support lead me to conclude that he does not pose a risk of recidivism.

> 3.    *The need for the sentence imposed to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner (§ 3553(a)(2)(D))*

The only issue here is the Defendant's need for medical care. I took this factor into consideration, and as stated above, I agree that Defendant needs medical care. But this need does not justify leniency. I will

recommend that he be placed in the best Bureau of Prisons facility available to provide for his care, including prescription medication.

### C.   The Kinds of Sentences Available (§ 3553(a)(3))

I considered the available sentencing options.   The 24-month consecutive sentence for aggravated identity theft is mandatory, but I considered non-prison sanctions for the other offenses.

### D.   The Kinds of Sentence Available and the Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant (§ 3553(a)(4)) and Pertinent Policy Statements (§ 3553(a)(5))

In determining a reasonable sentence in this case, I considered that there is a two-year mandatory sentence for Count Two.  I also considered the advisory guideline range and relevant policy statements, including those identified by the Government in its motion.

### E.   The Need to Avoid Unwarranted Sentencing Disparities (§ 3553(a)(6))

Courts should also avoid unnecessary disparities in sentences imposed for the same or similar crimes.  Doing so enhances predictability and credibility.  The circumstances of this crime and this Defendant are extraordinary.   As explained earlier, Defendant totally assumed Tim Brown's identity, and he did it to avoid being prosecuted for serious

21

crimes. An upward variance is not out of line with cases that bear some similarity to this case. <u>See, e.g.</u>, <u>United States v. Richardson</u>, 843 F. App'x 775, 779 (6th Cir. 2021) (affirming 48-month sentence in identity fraud case where guidelines range was 30–36 months and defendant's "identity fraud was not isolated" and his "deceptions were longstanding, numerous, and not contemplated by his criminal history score"); <u>United States v. Tucker</u>, 315 F. App'x 220, 222 (11th Cir. 2009) (affirming 60-month sentence where guideline range was only 6–12 months but the defendant had a "long history of using false identities in order to evade prosecution"); <u>see also</u> <u>United States v. Osorio-Moreno</u>, 814 F.3d 1282, 1287–88 (11th Cir. 2016) (affirming 120-month sentence in illegal reentry case where guideline range was 51–63 months, noting that "[t]he district court reasonably concluded that [the] sentence was necessary to achieve the goals of sentencing" in light of the defendant's extensive criminal history).

### F.    The Need to Provide Restitution (§ 3553(a)(7))

Restitution is not an issue in this case.

## IV.  Conclusion

The Government has advised me of factors that it believes justify an upward departure or a variance from the advisory guideline range. After considering the § 3553 factors, I conclude that the two-year term of

imprisonment requested by Defendant is inadequate to satisfy sentencing goals. And because a sentence within the sentencing guideline range would not reflect the seriousness of Defendant's offenses, promote respect for the law, or provide just punishment, an upward variance is required. That being the case, I deny the Motion for Upward Departure (Doc. 86) as moot.

In imposing a variance, a sentencing court must "ensure that the justification is sufficiently compelling to support the degree of the variance." Gall, 552 U.S. at 50. To strike that balance, I have carefully considered the information provided by the Government and Defendant. Based on the above analysis, I conclude that 48 months' imprisonment followed by 12 months of supervised release is a reasonable sentence. This sentence is "sufficient[] but not greater than necessary" to meet the goals of sentencing set forth in 18 U.S.C. § 3553(a).

**DONE** and **ORDERED** on August ___6___, 2021.

JOHN ANTOON II
United States District Judge

Copies furnished to:
United States Marshal

23

United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
Howard D. Farley, Jr.